**Lynn MARTIN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**ANSLINGER, INC., a corporation and Urban H. Anslinger, an individual, Defendants.**

**Civ. No. C–89–129.**

United States District Court, S.D. Texas, Corpus Christi Division.

May 26, 1992.

---

642

Michael H. Olvera, U.S. Dept. of Labor, Dallas, Tex., for plaintiff.

Richard J. Hatch, Prichard, Peeler, Hatch, Cartwright, Hall & Kratzig, Corpus Christi, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Senior District Judge.

This is an action brought by the Secretary of the United States Department of

Labor pursuant to Section 11(c) of the Occupational Safety and Health Act of 1970 (hereinafter "the Act"), codified at 29 U.S.C. § 660(c). The Secretary contends that the defendants, Anslinger, Inc. and its owner and president, Urban Anslinger, discharged an employee in retaliation for talking to an OSHA inspector about a safety hazard at a jobsite.

The case was tried before the court sitting without a jury and after trial, the parties submitted revised proposed findings of fact and conclusions of law. The defendants also submitted a reply to the Secretary's revised proposal. The case is now ready for decision.

### FINDINGS OF FACT

Based on the testimony and exhibits received at trial, and on the pleadings and pretrial order on file with this court, the court makes the following findings of fact as required by Fed.R.Civ.P. 52(a)[1]:

1. The plaintiff is Lynn Martin, Secretary of Labor (hereinafter "the Secretary"), United States Department of Labor.

2. Defendant Anslinger, Inc. (hereinafter "the company") was, at all times material to this action, a corporation having an office and place of business in Corpus Christi, Texas. The company was engaged in the commercial heating, ventilation, and air conditioning business.

3. Defendant Urban Anslinger (hereinafter "Mr. Anslinger") is, and was at all times material to this action, an individual residing in Corpus Christi, Texas, and the president and owner of the company.

4. Mr. Anslinger directed the employees of the company, and hired and fired employees.

5. Selso Rodriguez was hired by Mr. Anslinger to work for the company as a welder. He was employed by the defendants during the following periods: (a) January 11, 1979 to February 5, 1981; (b) from May 24, 1982 to July 22, 1982; and (c) from January 13, 1986 to January 30, 1987.

During the time of his employment with the company, Selso Rodriguez was a satisfactory employee. He had never been disciplined or terminated before January 30, 1987. On January 30, 1987, the last day of his employment with the company, Selso Rodriguez earned $10.50 per hour.

6. In December, 1986, Selso Rodriguez was working for the company at a construction site located at the Driscoll Hospital in Corpus Christi, Texas. His duties at the jobsite included welding and fabricating pipe. Two other employees of the company were working on the same crew with Selso Rodriguez—Candy Vasquez and Manuel Robledo, Jr. Candy Vasquez was fitting pipes together in preparation for welding. Manuel Robledo, Jr. was fitting and welding pipes. The foreman of their work crew was Gordon Davis.

7. The three-man crew comprised of Selso Rodriguez, Candy Vasquez, and Manuel Robledo, Jr. used several pieces of equipment provided by the company at the jobsite. This equipment included welding machines, welding leads, a stinger, pipe jacks, and grinders. Selso Rodriguez, who worked at the Driscoll site for a number of months, used only one welding machine at the site, which he described as a Lincoln 200 RPM gasoline welding machine. Manuel Robledo, Jr. used a different welding machine, identified as a Lincoln electrical welding machine.

8. The Lincoln electrical welding machine was in an unsafe condition and had been for a number of months before December, 1986. More specifically, an electrical cable on the machine had exposed live wiring because a rubber liner covering the cable was damaged. Selso Rodriguez voiced his concerns about the condition of the cable several times to foreman Gordon Davis. He specifically asked Davis to get the men either a new cable for the machine, or electrical tape with which to repair the existing cable.[2] Although Davis

---

1. Any findings of fact which contain conclusions of law shall be considered as such.

2. Rodriguez several times performed a makeshift repair of the machine using electrical tape, but he eventually depleted his supply of tape.

was aware of this unsafe condition, the condition continued unabated.

9. On or about December 17, 1986, Gordon Davis told Rodriguez, Vasquez, and Robledo that an OSHA inspector would be visiting the site the next day. He ordered the three men to hide some broken ladders the men were using, in preparation for the inspection. The employees did as they were told and hid the ladders. Davis gave these three men no additional orders.

10. On or about December 18, 1986, OSHA Compliance Officer Geronimo Gomez visited the Driscoll Hospital site during the course of an investigation of the company. During Gomez' inspection at the site, Rodriguez, Vasquez, and Robledo were cleaning water off the floor of their work area in the basement of the hospital (the water had been spilled by some electricians who had been working in the area). Gomez made his way to the basement where the three men were working. As Gomez was preparing to inspect the Lincoln electric welding machine, Robledo warned him that he might get an electrical shock in handling the machine. Rodriguez informed Gomez that there was no risk of shock because he had turned the machine off. Gomez then had a discussion with Rodriguez, asking him questions pertinent to the inspection. This interview lasted approximately 10 minutes. Davis, who was serving as the company's representative during the inspection, was present during the interview, as was Robert Knox, the project superintendent for the general contractor at the jobsite.

11. A few days after the OSHA inspection, Gordon Davis informed Mr. Anslinger that Selso Rodriguez had talked to OSHA officer Gomez during the inspection.

12. In late January, 1987, OSHA cited the company for violations noted at the previous month's inspection. One of two citations issued was for use of the Lincoln electrical welder with cables in need of repair, in violation of 29 C.F.R. § 1926.-351(b)(4).[3] This citation included notice that a $300 fine would be imposed.

13. On January 30, 1987, over one month after Gomez' inspection and after the company had been cited for violations, Mr. Anslinger met with Mike Hunter, Area Director for OSHA. This meeting had been scheduled on the initiative of Mr. Anslinger in an attempt to reduce the fine imposed by the citations. At the meeting, Mr. Anslinger was visibly very upset about the monetary penalty imposed, and told Hunter that he wanted to force "the welder" to pay it. Hunter advised Mr. Anslinger that he could not penalize an employee for participating in an OSHA inspection.[4]

14. Later on January 30, 1987, Mr. Anslinger instructed Gordon Davis to fire Selso Rodriguez. Davis did so. When Rodriguez asked Davis why he was being fired, Davis said that Mr. Anslinger had been told by Robert Knox that Rodriguez had talked "too much" to the OSHA inspector.

15. Later that same day, Manuel Robledo, Jr. also asked Gordon Davis why Selso Rodriguez was fired. Robledo was concerned that he himself should have been fired, because he was the one who had been using the Lincoln electric machine. Gordon Davis, however, gave Robledo the same explanation he had given to Rodriguez—that Rodriguez was fired because Robert Knox had told Mr. Anslinger that Rodriguez had talked "too much" to the OSHA inspector.

16. At a subsequent follow-up inspection conducted by officer Gomez at the jobsite on or about February 9, 1987, company employees were initially unresponsive to Gomez' questions, and attempted to avoid him. When Gomez informed Gordon Davis that he was having difficulty commu-

---

**3.** 29 C.F.R. § 1926.351(b)(4) provides as follows:

Cables in need of repair shall not be used. When a cable ... becomes worn to the extent of exposing bare conductors, the portion thus exposed shall be protected by means of rubber and friction tape or other equivalent insulation.

**4.** The written citation issued to the company for violation of 29 C.F.R. § 1926.351(b)(4) also contained the following conspicuous language:
**EMPLOYER DISCRIMINATION UNLAWFUL**— The law prohibits discrimination by an employer against an employee for filing a complaint or for exercising any rights under this Act....

nicating with the employees, Davis explained that the employees were concerned about their job security because Selso Rodriguez had been fired for speaking with Gomez during the previous inspection.

## CONCLUSIONS OF LAW

In accordance with Fed.R.Civ.P. 52(a), the court reaches the following conclusions of law [5]:

A. This court has jurisdiction over the subject matter of this action and over the parties pursuant to Section 11(c) of the Occupational Safety and Health Act of 1970, codified at 29 U.S.C. § 660(c), and pursuant to 28 U.S.C. §§ 1331, 1337, and 1345.

B. Venue is proper in this district.

C. Mr. Anslinger and the company were, at all times material to this action, employers within the meaning of the Occupational Safety and Health Act because they employed employees in a business affecting commerce within the meaning of 29 U.S.C. §§ 652(3), (5) and (6).

D. Selso Rodriguez was, at all times material to this action, an employee within the meaning of 29 U.S.C. § 652(6).

■ E. Section 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1), provides as follows:

No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

This section prohibits an employer from discharging or discriminating against any employee who exercises any right afforded by the Act. *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 3, 100 S.Ct. 883, 886, 63 L.Ed.2d 154 (1980).

The fundamental objective of the Act is to assure safe and healthful working conditions. *Id.* at 11–12, 100 S.Ct. at 890; 29 U.S.C. § 651. Section 11(c) is designed to further that objective, its primary purpose being to ensure that violations of OSHA are reported. *Marshall v. Intermountain Elec. Co., Inc.*, 614 F.2d 260, 262 (10th Cir.1980).

■ F. The Secretary has promulgated interpretative regulations consistent with the purpose of Section 11(c) of the Act.[6] Those regulations provide as follows:

§ 1977.11  Testimony.

Discharge of, or discrimination against, any employee because the employee 'has testified or is about to testify' in proceedings under or related to the Act is also prohibited by section 11(c). **This protection** would of course not be limited to testimony in proceedings instituted or caused to be instituted by the employee, but **would extend to any statements given in the course of judicial, quasi-judicial, and administrative proceedings, including inspections, investigations,** and administrative rule making or adjudicative functions. If the employee is giving or is about to give testimony in any proceeding under or related to the Act, he would be protected against discrimination resulting from such testimony.

§ 1977.12  **Exercise of any right afforded by the Act.**

(a) In addition to protecting employees who file complaints, institute proceedings, or testify in proceedings under or related to the Act, section 11(c) also protects employees from discrimination occurring because of the exercise 'of any right afforded by this Act.' Certain rights are explicitly provided in the Act; for example, there is a right to participate as a party in enforcement proceedings (section 10). Certain other rights exist by necessary implication. For example, employees may request information from the Occupational Safety and

---

**5.** Any conclusions of law containing findings of fact shall be considered as such.

**6.** *See Whirlpool*, 445 U.S. at 11 n. 15, 100 S.Ct. at 890 n. 15 (accepting the Secretary's designation of the regulation as interpretative).

Health Administration; such requests would constitute the exercise of a right afforded by the Act. **Likewise, employees interviewed by agents of the Secretary in the course of inspections or investigations could not subsequently be discriminated against because of their cooperation.**

(emphasis supplied). These regulations interpreting Section 11(c) indicate that the Act's protective scope is sufficiently broad to cover Selso Rodriguez' conduct in the instant case. The court therefore concludes that Selso Rodriguez' communications with OSHA officer Gomez on December 18, 1986 are protected by Section 11(c) of the Act.

■ G. In a case such as this, where the law prohibits an employment decision from being based on impermissible considerations, once the plaintiff has shown that his protected activity was a "motivating factor" in the employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected activity. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (discussing burden in Title VII cases). The plaintiff retains the burden of persuasion, by a preponderance of the evidence, on the issue of whether protected activity played a part in the employment decision. *See id.* at 246, 109 S.Ct. at 1788.

■ H. The plaintiff will rarely be able to produce direct evidence of an employer's motive for a discharge. *Abilene Sheet Metal, Inc. v. N.L.R.B.*, 619 F.2d 332, 338–39 (5th Cir.1980). The plaintiff can,

therefore, produce circumstantial evidence from which the court can infer a finding of improper motive. *Id.* In this case, however, we do have direct evidence of an impermissible motive, as well as circumstantial evidence from which an impermissible motive can clearly be inferred. The direct evidence consists of Gordon Davis' statements to both Selso Rodriguez and Manuel Robledo, Jr. that Rodriguez was being fired because he talked "too much" to the OSHA officer [7], as well as Davis' statement to officer Gomez at the subsequent inspection that Rodriguez had been fired for his part in the first inspection. The circumstantial evidence likewise supports an inference that Rodriguez was fired for cooperating with officer Gomez' during the inspection. The timing of the termination suggests an improper motive. Mr. Anslinger ordered foreman Davis to fire Rodriguez only after the company received written notice of the specific citations and the proposed fine. This inference is strengthened by the very close timing between the firing and Mr. Anslinger's meeting with OSHA Area Director Mike Hunter. At this meeting, Mr. Anslinger was visibly upset, and when he expressed the desire to hold an employee financially responsible for the resulting fine, he was informed that this was impermissible.[8] The court concludes that the preponderance of the evidence establishes that Mr. Anslinger intentionally terminated Selso Rodriguez from his employment with the company because Rodriguez had engaged in protected activity, in violation of Section 11(c) of the Act.

■ I. The defendants have attempted to justify Selso Rodriguez' termination by

---

**7.** This statement is not hearsay, even if Davis was merely repeating what Mr. Anslinger told him. Both Davis' statement and Mr. Anslinger's statements qualify independently as admissions under Fed.R.Evid. 801(d)(2). Moreover, even if Mr. Anslinger's statement was based on what he had been told by Robert Knox (i.e., Knox told Mr. Anslinger that Rodriguez had talked "too much"), Knox' statement is not hearsay as it is not being offered for its truth, but to show Mr. Anslinger's motive and state of mind.

**8.** The defendants contend that the timing of the termination, occurring as it did approximately

40 days after the inspection, does not show an impermissible motive because if Mr. Anslinger was going to terminate Rodriguez for talking to officer Gomez, he would have done so within a few days after the inspection, upon learning of *Rodriguez' cooperation and of the forthcoming* citation. This contention, however, ignores testimony showing that although the company knew it would be cited *for something* immediately after the inspection, it did not know the exact nature of the citations, nor the amount of the penalty, until approximately one month later when the citations were received.

alleging that he was terminated not for talking to OSHA officer Gomez but for failing to follow a direct order given before the inspection. This order allegedly consisted of an instruction given to Rodriguez by Gordon Davis to repair any unsafe equipment, remove it from the jobsite, or report the needed repair so that the problem could be remedied before the inspection. The court finds this "legitimate" reason for Selso Rodriguez' discharge to be a mere pretext for an impermissible, discriminatory motivation. The credible evidence shows that no such safety order, direct or otherwise, was given to Selso Rodriguez before the inspection. Rather, Rodriguez, Robledo, and Vasquez were merely ordered to hide some broken ladders. The credible evidence also shows that Selso Rodriguez *did* report the damaged cable on the Lincoln electrical welding machine to Gordon Davis on several occasions before the inspection, but that the damage was not repaired. Moreover, the credible evidence shows that Selso Rodriguez was treated less favorably than at least one, and perhaps two other employees who also ostensibly failed to obey the same alleged order.[9] Finally, the evidence also shows that no other employee of the company had ever been fired for failing to obey a similar safety order, or for failing to obey any order, for that matter. Accordingly, the court concludes that the defendants have not shown by a preponderance of the evidence that they would have discharged Selso Rodriguez even in the absence of his protected activity.[10]

J. Pursuant to Section 11(c)(2) of the Act, the court is empowered to award Selso Rodriguez back pay for the period during which he was unemployed. The court's finding of discrimination presumptively entitles him to back pay unless the defendants can prove by clear and convincing evidence that Selso Rodriguez would not have stayed in his job absent the discrimination. *Valdez v. Church's Fried Chicken, Inc.*, 683 F.Supp. 596, 636 (W.D.Tex.1988). Because the defendants' unlawful conduct has created the necessity for a back pay award, any "uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating party." *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir.1975) (quoting *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1380 n. 53 (5th Cir.1974); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260–61 (5th Cir.1974)).

The defendants contend that the award of back pay should be limited because Selso Rodriguez would have been laid off by the company in March, 1987 even if he had not been discharged on January 30, 1987. However, while the evidence shows that the company's business was somewhat cyclical and that some employees were laid off in March, 1987, the evidence also shows that between the second quarter of 1987 and the fourth quarter of 1990, the company typically employed one or more welders, except during four quarterly periods in

9. Manuel Robledo, Jr., who used the Lincoln electrical welding machine in his work, was not discharged, nor was Candy Vasquez, who worked in the same area where the machine was located. Robledo clearly knew about the damaged cable on his machine, as he so testified. However, neither of these men was discharged, even though Davis testified that he assumed that all three men—Rodriguez, Robledo, and Vasquez—knew about the damaged cable on the machine before the inspection because they told the inspector that he might get shocked. (The credible evidence shows that it was actually Robledo who told the inspector to be wary of getting shocked, due to the presence of water on the floor; Robledo did not disclose the damaged cable to the inspector.) Therefore, although according to Davis, three persons ostensibly knew about the safety problem and allegedly failed reported it, only Rodriguez—who had an extended discussion with the inspector—was discharged for allegedly failing to obey orders.

10. At trial, the defendants offered into evidence proposed Exhibit 18, a memo prepared by defense counsel which purports to detail the defendants' version of the events pertinent to this case, including Selso Rodriguez' alleged noncompliance with the purported safety order. This document was obviously prepared in anticipation of litigation. Assuming that it is admissible for some purpose under the Federal Rules of Evidence, the court finds the document to be inherently untrustworthy and has disregarded the statements contained therein.

which no welders were employed.[11] During 1990, the company employed an even larger number of welders. The company ceased employing welders in 1991, and ceased employing all persons on December 31, 1991.

■ There was no evidence presented by the defendants suggesting what criteria (i.e., seniority) were used by the company to determine which welders would be retained during a layoff and which would not. Although Selso Rodriguez was hired as a welder, the evidence shows that he was also capable of performing some pipefitting duties in connection with his welding. The defendants did not present any evidence indicating whether Rodriguez' limited pipefitting skills would have been of some benefit to him during welder layoffs, but the court concludes based on the credible evidence that Rodriguez did not possess all the skills of a "combination" pipefitter/welder, in particular because his reading abilities were somewhat limited. Because the court concludes that Selso Rodriguez did not possess the skills required to be a "combination" employee, the court also concludes that the defendants have established by clear and convincing evidence that he would have been laid off during periods in which the company employed "combination" employees but no welders. However, the defendants have not established by clear and convincing evidence that Selso Rodriguez would have been laid off during the remaining relevant periods from March, 1987 to December, 1991 in which the company employed welders.

Accordingly, the court concludes that had Selso Rodriguez not been wrongfully discharged, he would have continued to work for the company during the following quarterly periods: the first, second, and third quarters of 1987; the third and fourth quarters of 1988; the first, second, and fourth quarters of 1989; and all four quarters of 1990.

■ K. Given the cyclical nature of the company's business, determining the amount of pay which Selso Rodriguez would have earned if not for his wrongful discharge is a process fraught with uncertainty. Nevertheless, the court has concluded that Selso Rodriguez would have been employed by the company for various periods from 1987 through 1990, and the court must therefore resolve any uncertainty based on the available evidence and make a determination of the number of hours for which Selso Rodriguez would have worked and received compensation. Resolving this uncertainty in light of the evidence, the court finds that the highest number of hours worked by any welder during the relevant periods is an appropriate measure of the number of hours which Selso Rodriguez would have worked had he remained employed by the company.[12]

■ After he was discharged on January 30, 1987, Selso Rodriguez remained unemployed for a number of months that year. During the first quarter of 1987, before his discharge, Selso Rodriguez worked 176 hours and earned $1,848 working for the company. The court finds that Selso Rodriguez would have worked for a total of 759 hours during the year 1987 had he not been wrongfully discharged. At his hourly rate of $10.50 per hour, Selso Rodriguez would therefore have earned $7,969.50 from the company that year. Instead, he actually earned $6,043.07 working as a self-employed welder. Deducting the amounts which Selso Rodriguez actually earned from his hypothetical earnings, the court concludes that Selso Rodriguez suffered a loss of earnings and is entitled to an award of back pay in the amount of $78.43 for the year 1987.[13]

---

**11.** These four periods were the fourth quarter of 1987; the first and second quarters of 1988; and the third quarter of 1989.

**12.** A similar method of computing a back pay award was employed by the court in *Donovan v. George Lai Contracting, Ltd.*, 629 F.Supp. 121, 123 (W.D.Mo.1985).

**13.** After his discharge in 1987, Selso Rodriguez also received $5,328 in unemployment compensation. The court concludes that this collateral benefit should not be deducted from his back pay award. *See Johnson v. Chapel Hill Independent School Dist.*, 853 F.2d 375, 382 (5th Cir. 1988) and *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1168 (5th Cir.1980) (both indicating

The court finds that Selso Rodriguez would have worked for the company for a total of 546 hours during the year 1988 had he not been wrongfully discharged. At his hourly rate of $10.50 per hour, he would therefore have earned $5,733 from the company that year. He actually earned in excess of that amount working as a welder. The court therefore concludes that Selso Rodriguez suffered no loss of earnings during the year 1988 and is not entitled to an award of back pay for that year.

The court finds that Selso Rodriguez would have worked for the company for a total of 793 hours during the year 1989 had he not been wrongfully discharged. At his hourly rate of $10.50 per hour, he would therefore have earned $8,326.50 from the company that year. He actually earned in excess of that amount working as a welder. The court therefore concludes that Selso Rodriguez suffered no loss of earnings during the year 1989 and is not entitled to an award of back pay for that year.

The court finds that Selso Rodriguez would have worked for the company for a total of 1,835 hours during the year 1990 had he not been wrongfully discharged. At his hourly rate of $10.50 per hour, he would therefore have earned $19,267.50 from the company that year. Instead, he actually earned only $12,566 working as a welder. Deducting the amount which Selso Rodriguez actually earned from his hypothetical earnings, the court concludes that Selso Rodriguez suffered a loss of earnings and is entitled to an award of back pay in the amount of $6,701.50 for the year 1990.[14]

The court finds that during the year 1991, Selso Rodriguez would not have worked for the company. He therefore suffered no loss of earnings for that year.

Based on the foregoing, the court concludes that Selso Rodriguez is entitled to back pay in the amount of $6,779.93 as compensation for income which he would have earned from the company had he not been wrongfully discharged.

■ L. In addition to an award of back pay, Selso Rodriguez is entitled to both pre- and post-judgment interest on that award, in view of his wrongful termination. The Secretary shall, within ten days from the date stamped on the face of these findings of fact and conclusions of law, submit a brief proposing an appropriate rate of pre-judgment interest, together with the calculations based on the amount of the award of back pay. Thereafter, the defendants shall have ten days in which to submit a response to the Secretary's proposal.

■ M. Section 11(c)(2) of the Act empowers the court, for cause shown, to restrain violations of Section 11(c)(1). The court finds an injunctive relief to be appropriate in this case, even though the defendant company is no longer doing business. An injunction is warranted, in the event that the company or Mr. Anslinger resumes employing persons, given the atmosphere of intimidation created by Mr. Anslinger's retaliatory action against Selso Rodriguez as manifested by the behavior of the company's employees at the second OSHA inspection. Accordingly, the defendants will be permanently enjoined from violating Section 11(c) of the Act.

■ N. Section 11(c)(2) of the Act empowers the court to order other appropriate relief upon finding a violation of Section 11(c)(1). In this case, the court concludes that it is appropriate to enjoin defendant Urban Anslinger from providing negative references upon inquiries about Selso Rodriguez by prospective employers.

## CONCLUSION

In accordance with the foregoing, judgment will be entered in favor of the plaintiff Secretary, awarding back pay in the amount of $6,779.93, together with pre-judgment interest to be determined. The

that decision whether to deduct unemployment compensation from back pay awards is discretionary).

14. In 1990, Selso Rodriguez also received $133 in unemployment compensation. The court concludes that this collateral benefit should not be deducted from the award of back pay.

**650**

award shall bear post-judgment interest at the legal rate from the date of entry of judgment until satisfaction. In addition, costs of action will be awarded in favor of the Secretary. Finally, the court will enjoin the defendants from violating Section 11(c) of the Act in the future and will enjoin defendant Urban Anslinger from providing negative references to inquiries about Selso Rodriguez.