778 A.2d 1194

**William H. O'ROURKE, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, Department of Corrections, Martin F. Horn, Commissioner, Pennsylvania Department of Corrections, David H. Larkins, Superintendent, State Correctional Institution–Dallas, Thomas Stachelek, Deputy Superintendent, State Correctional Institution at Dallas, Captain Thomas Martin, John Docknovitch, Mark Rapson, and Samuel Zambeto, Appellees.**

Supreme Court of Pennsylvania.

Submitted May 4, 2001.

Decided Aug. 21, 2001.

Reconsideration Denied Oct. 30, 2001.

162

David Paul Tomaszewski, Wilkes Barre, for William H. O'Rourke.

Raymond W. Dorian and Randall N. Sears, Camp Hill, for Department of Corrections, et al.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR, JJ.

## *OPINION*

SAYLOR, Justice.

This is a direct appeal from an order of the Commonwealth Court dismissing Appellant William H. O'Rourke's petition for review under Pennsylvania's Whistleblower Law. The primary question presented is whether adverse personnel action taken against an employee of a public body as a direct result of his filing of a good-faith report of wrongdoing or waste violates the Whistleblower Law, although the employer did not harbor a retaliatory motive.

Appellant, William O'Rourke ("O'Rourke"), has been employed by Appellee, The Pennsylvania Department of Corrections (the "Department"), since the 1980s, performing various tasks related to the preparation and distribution of food to inmates at the State Correctional Institute at Dallas ("SCI–Dallas"). At all relevant times, his position was that of food service instructor ("FSI") in the culinary department at SCI–Dallas, which relies heavily upon inmate labor to staff the kitchen and food service lines in the dining hall. Each FSI is responsible for training and supervising the work of a group of inmate-employees during a given shift.

On January 17, 1997, O'Rourke filed a petition for review in the Commonwealth Court's original jurisdiction alleging violations of Pennsylvania's Whistleblower Law,[1] by each superior in his chain of command within the Department, including: food service supervisor ("FSS") Samuel Zambeto (O'Rourke's immediate supervisor); food service manager ("FSM")-I Mark

1. Act of December 12, 1986, P.L. 1559, §§ 1–8, codified at 43 P.S. §§ 1421–1428.

Rapson; FSM–II John Docknovitch; Captain Thomas Martin, director of security at SCI–Dallas; Thomas Stachelek, deputy superintendent at SCI–Dallas; Superintendent David H. Larkins, the warden at SCI–Dallas; and Martin F. Horn, Commissioner of the Department (collectively, "Appellees"). The petition arose out of events that transpired in the culinary department at SCI–Dallas beginning in April of 1996. Sometime prior to April of 1996, O'Rourke became aware of a scheme whereby thousands of pounds of meat products were being stolen from the culinary department and provided to certain inmates, who ran an illegal sandwich-making enterprise within the prison.[2] According to O'Rourke, the inmate-employees smuggled these sandwiches out of the culinary department into the general inmate population and traded them for cigarettes, the de facto currency of the prison barter economy. After the meat products were stolen, the culinary department's inventory books were fraudulently altered—at least in part by inmate-clerks and with the knowledge of some culinary department managers—to conceal the ongoing theft.

O'Rourke prepared a report regarding the above-described activities, charging various co-workers and supervisors with theft and mismanagement. Skeptical that the culinary department management would take corrective action, O'Rourke submitted his report directly to Deputy Superintendent Stachelek. An investigation into the matter ensued, led chiefly by Captain Martin. According to the Commonwealth Court, Captain Martin ultimately reached the generous conclusion that FSM–II Docknovitch's administration of the culinary department "bordered on the fringe of mismanagement." On May 16, 1996, Captain Martin submitted his report to the warden, and various corrective measures were implemented, including placement of a lock on the freezer door, implementation of twice daily inventories, and a restriction that inventory accounting be performed by culinary department staff, and not inmate-clerks.

Shortly after he transmitted his report to Deputy Superintendent Stachelek, O'Rourke began to experience a generally

2. The record reveals that over 15,000 pounds of meat had been stolen.

hostile working environment and was to some extent ostracized by various culinary department staff. According to O'Rourke, even the inmates were encouraged to commit petty acts of irritation and harassment, with the support of O'Rourke's immediate supervisors in the department. Of particular concern were O'Rourke's reassignment from kitchen duties to the food service line in the dining hall—a less desirable post due to a reduction in skilled tasks and supervisory duties—and O'Rourke's removal from a list of employees eligible to work as a supervisor in return for extra pay and experience tending to lead to eventual promotion. O'Rourke contended that all of these adverse actions were carried out in an effort to chastise him for having revealed the above-described theft and mismanagement within the culinary department.

O'Rourke requested statutory remedies pursuant to sections 4 and 5 of the Whistleblower Law, 43 P.S. §§ 1424, 1425, including: a) an injunction directing that all retaliatory activity cease and desist, *see* § 1424(a); b) an award of lost back wages, *see* § 1425; and c) an award of attorney's fees and costs, *see id.* In his post-trial brief, O'Rourke expanded his request to include $100,000 for "pain and suffering" as a component of "actual damages" compensable under Section 5 of the Whistleblower Law, *see* 43 P.S. § 1425. Prior to trial, the Commonwealth Court granted summary judgment in favor of Appellees as to all acts of alleged retaliation occurring prior to July 21, 1996, based upon the 180–day statute of limitations, 43 P.S. § 1424(a)(providing that "[a] person who alleges a violation of this act may bring a civil action ... within 180 days after the occurrence of the alleged violation"). *See O'Rourke v. Pennsylvania Dep't of Corrections,* 730 A.2d 1039 (Pa.Cmwlth.1999).[3]

---

**3.** The Commonwealth Court rejected two other summary judgment arguments, not here relevant. Also, the Commonwealth Court erroneously reported the petition for review filing date as January 21, 1997, and the 180–day limitation period as July 25, 1996. *See O'Rourke,* 730 A.2d at 1042. At the start of the hearing, the parties stipulated that the correct dates are January 17, 1997, and July 21, 1996, respectively. In its post-trial memorandum opinion, the Commonwealth Court corrected this error.

Before the Commonwealth Court, O'Rourke presented evidence of alleged retaliatory conduct occurring on or after July 21, 1996; he was also permitted to adduce evidence of events prior to July 21, 1996, for the limited purpose of providing background to the alleged retaliatory acts occurring on or after that date. The Commonwealth Court ultimately dismissed the petition by order dated August 25, 2000. In a memorandum opinion, the court set forth findings of fact and conclusions of law. On October 25, 2000, the Commonwealth Court denied O'Rourke's post-trial motions. This timely appeal followed.

In its findings, the Commonwealth Court determined that many of the alleged retaliatory acts occurred before July 21, 1996, and hence were time-barred. Several others occurred or continued after such date, and hence were not. A representative sample, as found by the Commonwealth Court, includes: O'Rourke was kept off the acting supervisor list until late September of 1996 (having initially been removed from that list in April of 1996, shortly after filing his report), thus resulting in lost opportunities to perform supervisory duties and be compensated accordingly for approximately two months after July 21, 1996; O'Rourke was assigned to work in the kitchen less frequently, and was more frequently stationed in the dining hall; on September 15, 1996, two fellow FSIs misplaced various food products while O'Rourke was assigned to kitchen work, an incident O'Rourke interpreted as staged to create a problem during O'Rourke's kitchen shift; when O'Rourke returned to work following treatment for a lung condition, FSS Zambeto intentionally smoked several cigarettes in close proximity to O'Rourke, resulting in a written reprimand being issued to Zambeto; a note stating, "Burning supervisors will not further career," was placed next to O'Rourke's work schedule in the culinary office, and allowed to remain there by FSM–I Rapson; and O'Rourke was subjected to numerous incidents of petty conduct by co-workers and inmates such as name calling, whistling, and insults written on the schedule and on various memos.[4]

4. To the Department's credit, the Commonwealth Court found that the SCI–Dallas management investigated each of O'Rourke's allegations

The Commonwealth Court ultimately concluded that some of the events O'Rourke interpreted as retaliatory—such as the misplacement of food products during O'Rourke's kitchen shift—were not targeted at O'Rourke, but occurred for independent reasons. The court also held that, although O'Rourke was subjected to various types of harassment from inmates and co-workers, such activities did not materially affect O'Rourke's compensation, terms, location or privileges of employment, and hence, were not compensable under the Whistleblower Law. Finally—and most pertinent to the instant appeal—the Commonwealth Court held that the Department was not liable for having removed O'Rourke from kitchen duties and from the acting supervisor list; it found that such measures were not motivated by a desire to exact retribution, but were carried out to reduce the heightened potential for conflict in the culinary department following O'Rourke's April 16, 1996, report and the ensuing investigation by Captain Martin. Consequently, the court held that Appellees did not violate the Whistleblower Law, and dismissed the petition without reaching the question of damages.[5]

Section 3(a) of the Whistleblower Law lists the statutory protections on which O'Rourke relies. That section provides, in pertinent part:

> **(a) Persons not to be discharged.**—No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee ... makes a good faith report ... to the employer or appropriate authority [of] an instance of wrongdoing or waste.

and took corrective action as appropriate, including changing various SCI–Dallas policies and procedures.

**5.** Further, the Commonwealth Court opined that, in any event, O'Rourke's request for $100,000 for "pain and suffering" was beyond the scope of the remedies afforded under the Whistleblower Law. In view of the court's summary treatment of this question, however, and the character of its conclusion as *dictum*, we decline to address it at this stage in the litigation.

43 P.S. § 1423(a). Wrongdoing is defined as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation . . . or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. § 1422.

We defer here to the Commonwealth Court's finding that the petty conduct by O'Rourke's co-workers and immediate supervisors did not materially affect his terms or conditions of employment, as it finds adequate support in the evidence. There is one aspect of the court's disposition, however, that merits further review. The Commonwealth Court determined that "[t]he only employer-sanctioned conduct that arguably constituted retaliation was the decision by FSM–II Docknovitch and FSM–I Rapson to remove O'Rourke from the acting supervisor list and reduction of his kitchen work assignments ." The court indicated, however, that:

> [a]lthough Respondents FSM–II Docknovitch and FSM–I Rapson did remove O'Rourke from the acting supervisors list and his primary assignment in the kitchen *in response to his report of wrongdoing* dated April 11, 1996, Respondents FSM–II Docknovitch and FSM–I Rapson proved by a preponderance of the evidence that separate and legitimate, non-pretextual reasons existed for these actions.
>
> \* \* \*
>
> [B]oth of these changes to the conditions of O'Rourke's employment constitute management discretionary actions provided they were motivated by legitimate, non-pretextual employer objectives rather than punishment for a report of wrongdoing. *In the instant matter, the corrupt activity of the inmate-employees became accepted practice within the culinary department. When O'Rourke made the courageous decision to expose this pervasive theft, the resulting investigation implicated a number of his co-workers, supervisors and managers as, at best, complacent and in some cases actually facilitating this activity. The culinary staff then polarized where one camp supported O'Rourke's action and the other naturally developed a substantial amount of animosity and ill-will toward O'Rourke. Faced with this*

*circumstance, FSM–II Docknovitch and FSM–I Rapson chose to place O'Rourke in situations that they deemed would minimize the potential for conflict.* Such an action constitutes a legitimate exercise of management discretion particularly where large numbers of inmates, many of which had their illegal sandwich making business shut down, congregate freely during meal time creating a greater risk for violent activity.

(Emphasis added).

The above passage contains three essential points: 1) O'Rourke suffered adverse personnel action as a direct result of his report of wrongdoing; 2) O'Rourke's supervisors took such action due to a perceived need to reduce the potential for conflict, and not from a desire to punish O'Rourke for filing his report; and 3) because O'Rourke's supervisors did not proceed with retaliatory motives, the Whistleblower Law does not protect O'Rourke from such consequences. The first two propositions amount to factual findings, and hence, are entitled to deference.[6] The third constitutes a legal conclusion regarding the scope of protection afforded by the statute; therefore, we undertake an independent analysis of the question.[7]

Section 4(b) of the statute sets forth the requirements that a petitioner must satisfy to make out a *prima facie* case of a violation of the Whistleblower Law. That section provides, in pertinent part:

(b) **Necessary showing of evidence.**—An employee alleging a violation of this act must show by a preponderance of

**6.** O'Rourke asserts that the evidence of record indicates his supervisors were in fact motivated by a desire to seek revenge. However, it is not the function of the appellate court to find facts, but to determine whether there is evidence in the record to justify the trial court's findings. If so, this Court is bound by them. *See Allegheny County v. Monzo*, 509 Pa. 26, 35, 500 A.2d 1096, 1101 (1985). Presently, the record contains sufficient evidence to support the Commonwealth Court's findings in this regard.

**7.** Although we accord deference to a trial court with regard to factual findings, our review of legal conclusions is *de novo*. *See Commonwealth ex rel. Gibson v. DiGiacinto*, 497 Pa. 66, 70, 439 A.2d 105, 107 (1981).

the evidence that, prior to the alleged reprisal, the employee ... had reported ... in good faith ... an instance of wrongdoing or waste to the employer or an appropriate authority.

43 P.S. § 1424(b). If a petitioner satisfies the above requirement, the burden shifts to the respondent to prove its actions were lawful pursuant to Section 4(c) of the act:

(c) Defense.—It shall be a defense to an action under this section if the defendant proves by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual.

43 P.S. § 1424(c).

After setting forth extensive findings, the Commonwealth Court ultimately concluded that Appellees successfully rebutted O'Rourke's charges by satisfying the requirements of Section 4(c), *supra.* The court, however, was not precise in the manner in which it reached the question of rebuttal. Initially, the court stated that O'Rourke failed to prove that Appellees had violated the Whistleblower Law. The remainder of the disposition, however, was devoted largely to demonstrating that, in the court's view, the Department satisfied the requirements of Section 4(c) in that Appellees' seemingly retaliatory actions in fact occurred for reasons that were separate and legitimate, and non-pretextual.

It is clear from the above statutory provisions that, to make out a *prima facie* case of reprisal, O'Rourke had to show, by a preponderance of the evidence, that, prior to the alleged acts of retaliation, he had made a good faith report of wrongdoing to appropriate authorities. *See* 43 P.S. § 1424(b). This Court has also held that a Whistleblower Law claimant must come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts. *See Golaschevsky v. Department of Envtl. Protection,* 554 Pa. 157, 163, 720 A.2d 757, 759 (1998). The record and the Commonwealth Court's findings leave little doubt that O'Rourke met those requirements, as the adverse actions at issue occurred

"in response to" O'Rourke's report. The burden then shifted to Appellees to rebut O'Rourke's charges pursuant to Section 4(c), 43 P.S. § 1424(c), *supra.* *See generally Golaschevsky*, 554 Pa. at 164–65, 720 A.2d at 760 (Nigro, J., concurring in result)(discussing the Whistleblower Law's burden-shifting scheme). The question that must be resolved, therefore, is whether the Commonwealth Court correctly interpreted § 1424(c) to encompass the Department's actions in the present case.

That provision requires that the employer's reasons for its adverse action satisfy multiple criteria: that they be "separate," "legitimate," and "non-pretextual," that is, not merely a pretext for exacting retribution.[8] As noted, we defer to the Commonwealth Court's finding that the Department's subjective motivations were not pretextual. The pertinent question, therefore, is whether such actions were "separate and legitimate" for purposes of Section 4(c), when it is conceded that the adverse personnel decisions at issue were taken as a direct result of O'Rourke's report of illegal activity. The answer depends upon the meaning of the word "separate." If the intended meaning is "separate from a retaliatory motive," then the Department's actions were indeed "separate" because, as noted, the trial court found that they were taken to reduce the potential for conflict within the department. If, however, the term signifies that the employer must act with a rationale that is "separate from the report of wrongdoing," a different result obtains, as the decisions at issue were concededly taken "in response to" the report of wrongdoing. The Whistleblower Law does not state which meaning is intended. It is, therefore, ambiguous on that point, and hence, statutory interpretation is warranted. 1 Pa.C.S. § 1921(c); *see Workmen's Compensation Appeal Bd. v. Hartlieb*, 465 Pa. 249, 255, 348 A.2d 746, 749 (1976); *In re Kritz' Estate*, 387 Pa. 223, 227, 127 A.2d

---

**8.** It cannot be assumed that a rationale which is non-pretextual is necessarily "separate" and "legitimate" for purposes of the statute. Such interpretation would render the phrase "separate and legitimate" mere surplusage, and offend the general rule of statutory construction that "every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a).

720, 723 (1956)("[R]ules of statutory construction are to be resorted to only when there is [patent or latent] ambiguity.").

■ The cardinal rule of all statutory construction is to ascertain and effectuate the intent of the Legislature. *See* 1 Pa.C.S. § 1921(a). To accomplish that goal, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear. *See Consulting Engineers Council of Pennsylvania v. State Architects Licensure Bd.*, 522 Pa. 204, 208, 560 A.2d 1375, 1377 (1989). We may also consider other factors, such as: the mischief to be remedied, *see* 1 Pa.C.S. § 1921(c)(3); the object to be attained, *see* 1 Pa.C.S. § 1921(c)(4); and the consequences of a particular interpretation, *see* 1 Pa.C.S. § 1921(c)(6). We address these considerations seriatim.

(a) Context of statutory language

The statutory language provides at least two clues to the meaning of the phrase "separate and legitimate" in Section 4(c) of the statute, 43 P.S. § 1424(c). The first is contained in the requirement that, to make out a *prima facie* case of a violation, the employee must allege "reprisal" by the employer. *See* 43 P.S. § 1424(b). Reprisal is essentially a synonym for retaliation.[9] This would tend to indicate that the term "separate and legitimate"—and in particular, the word "separate"—signifies "separate from a retaliatory motive," as absent such motive, the employer's action cannot properly be deemed reprisal. On the other hand, the statute broadly proscribes adverse employer action taken "because" the employee reported wrongdoing or waste. *See* 43 P.S. § 1423(a). Read in the context of such provision, the word "separate" appears to address more generally the presence, *vel non,* of any connection between the report of wrongdoing and the adverse action, independent of the employer's subjective motivations. This would tend to indicate that, if the action was taken as a result of the report of wrongdoing, the resulting harm is compensable under the act, even if the employer's

9. The dictionary defines reprisal as "**1.** retaliation against an enemy by the infliction of equal or greater injuries. **2.** an act of retaliation." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (2d ed.2000).

rationale is otherwise legitimate and non-pretextual. Such view is strengthened by the fact that the prohibited conduct is broadly defined to include not only retaliation, but also any discrimination against an employee occurring as a result of that employee's good-faith report of wrongdoing. *See* 43 P.S. § 1423(a)(prohibiting discrimination *or* retaliation). Where an employee is singled out for inferior treatment as a result of having reported wrongdoing, it can reasonably be argued that such employee was subjected to "discrimination" for purposes of Section 1423(a), whether or not the employer's actions proceeded from vengeful motivations. In view of the above, the language of the statute as a whole does not strongly favor one interpretation over the other, and hence, we turn to other statutory considerations for guidance.

(b) Mischief to be remedied.

An employee of a public body is often in the best position to know that illegal or unethical activities are occurring within that body, and thus, to report such activities. This is particularly significant because, if such illegalities are taking place, the employer and/or the individuals who benefit ordinarily have no incentive to reveal them and, additionally, may be adept at concealing them from the outside world. Therefore, the Commonwealth and its citizens benefit substantially when employees aid in the enforcement of legal and ethical codes "by raising substantiated claims of wrongdoing through protected procedural channels," *Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor,* 992 F.2d 474, 478 (3d Cir.1993), which serves the interests of exposing and halting the illegalities, and relieves the government of some of the expenses of investigation and litigation. Just as surely, however, an employee who becomes aware of wrongful activities within a public entity will often feel compelled to remain silent about the illicit conduct, lest he be subjected to harassment and other adverse action by his management and co-workers. *See United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 739 (3d. Cir.1997)(recognizing that *qui tam* relators under the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.,* face the "Hobson's choice of keeping silent

about the fraud, and suffering potential liability (and guilty consciences), or reporting the fraud and suffering repercussions, some as extreme as dismissal")(internal quotation omitted). Accordingly, absent some measure of assurance that the employee will ultimately be put in no worse a position for having exposed the wrongdoing, the Commonwealth largely forgoes the benefit of such "employee-reporters."

### (c) Object to be attained

In light of the above, we believe that the Whistleblower Law is not primarily designed to punish an employer for harboring retaliatory motives, but is, rather, chiefly a remedial measure intended to "enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing." *Davis v. Ector County*, 40 F.3d 777, 785 (5th Cir.1994)(articulating the purpose of a similar Texas whistleblower law); *see Pennsylvania Game Comm'n v. State Civil Service Comm'n (Toth)*, 561 Pa. 19, 29 n. 10, 747 A.2d 887, 892 n. 10 (2000) (noting that Pennsylvania's whistleblower law "is specifically designed to protect employees from adverse employment actions when making a good faith report regarding an instance of wrongdoing or waste"); *cf. Melchi v. Burns Int'l Sec. Serv., Inc.*, 597 F.Supp. 575, 585 (E.D.Mich.1984)(stating that Michigan's whistleblower law is "a remedial measure designed to protect employees that report violations or suspected violations of the law"). In enacting the statute, the General Assembly aimed to effectuate such design by ensuring that employees are not discouraged from reporting violations of legal or ethical codes.[10] Additionally, recovery under the statute is proportionate to the harm suffered, as punitive damages are not available. *See generally* 43 P.S. § 1425.

---

**10.** *Cf. Trimmer v. United States Dep't of Labor*, 174 F.3d 1098, 1104 (10th Cir.1999)(noting that "[w]histleblower provisions are intended to promote a working environment in which employees are relatively free from the debilitating threat of employment reprisals for publicly asserting company violations"); *Marshall v. Intermountain Elec. Co.*, 614 F.2d 260, 262 (10th Cir.1980)(stating that the purpose of the Occupational Safety and Health Act ("OSHA") is to assure safe and healthful working conditions, and that the whistleblower protection provision

Finally, we are unaware of any authority providing that whistleblower statutes are primarily punitive, rather than remedial, in that their chief purpose is to punish employers for harboring bad motives.[11]

## (d) Consequences of a particular interpretation

The Commonwealth Court found that O'Rourke's supervisors removed him from kitchen duties and from the active supervisor's list due to their perception that his report had a "polarizing" effect, with one group of co-workers rallying to

contained therein is designed to ensure that OSHA violations are reported); *Martin v. Anslinger, Inc.*, 794 F.Supp. 640, 645 (S.D.Tex. 1992)(same); *Donovan v. R.D. Andersen Construction Co., Inc.*, 552 F.Supp. 249, 251 (D.Kan.1982)(same); *Melchi*, 597 F.Supp. at 581 (holding that Section 704 of Title VII of the federal Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, and the Michigan whistleblower law share a common purpose "to protect the integrity of the law by removing barriers to employee efforts to report violations of the law"); *United States ex rel. Neher v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir.1993)(holding that the FCA's *qui tam* provisions "do not act as a penalty; rather, they provide incentive to government 'whistleblowers' and compensate such individuals for their time and trouble"); *Wiggins v. Eastern Associated Coal Corp.*, 178 W.Va. 63, 357 S.E.2d 745, 748 (1987)(observing that the primary purpose of whistleblower protection provisions of state and federal mine safety legislation is to ensure the reporting of safety violations); *Brooks v. Stroh Brewery Co.*, 95 N.C.App. 226, 382 S.E.2d 874, 877 (1989)(noting that the primary purpose of federal and state whistleblower laws is to ensure that employees are not discouraged from reporting violations of the law).

11. Section 1426 of the Whistleblower Law, 43 P.S. § 1426, contains measures which are arguably penal, such as a civil fine and possible suspension from public service for up to six months. However, these measures are either modest or tied to a specific set of circumstances. In particular, civil fines may not exceed $500. Additionally, suspension from service is reserved for cases where the employer violated the act with the specific intention of discouraging the reporting of criminal activity. Even in that circumstance, suspension is within the court's discretion. Although to some extent the statute is arguably penal as to the employer, *see generally Neher*, 11 F.3d at 137 n. 1 (noting that a statute can be remedial as to one party, yet penal as to another), such provisions are secondary to—and supportive of—the primary purpose of the statute, which is to encourage employees to come forward in good faith with information about substantial illegal or unethical conduct. *See also* 43 P.S. § 1424, Historical and Statutory Notes (stating, in relevant part, that the purpose of the act is to "provid[e] protection for employees who report a violation ... of State, local or Federal law").

support O'Rourke, and another camp opposing him. Notably, however, in many scenarios involving reports of wrongdoing or waste, a heightened potential for conflict will ensue. Immunization from liability for adverse personnel action so long as the action is grounded in the employer's legitimate desire to minimize conflict would seriously undermine the statutory scheme, as such immunity would serve as an additional deterrent to reporting by employees.

In sum, we conclude that adopting an interpretation of the phrase "separate and legitimate" wherein the word "separate" is addressed solely to the subjective motivation of the employer would fail to effectuate the legislative intent underlying the Whistleblower Law and run contrary to the precept that remedial statutes are to be liberally construed to effect their objects. *See generally* 1 Pa.C.S. § 1928(c).

 The remaining question is the proper standard by which to assess the provision of the Whistleblower Law allowing the employer to escape liability if it proves that its actions were taken for "separate and legitimate" reasons. That question should be answered with a view, not only to protecting employees from retaliation, but to protecting employers and co-workers from harassment by a reporting employee through actual or threatened accusations of wrongdoing. *See Wolcott v. Champion Int'l Corp.,* 691 F.Supp. 1052 (W.D.Mich.1987); *Shallal v. Catholic Social Serv. of Wayne County,* 455 Mich. 604, 566 N.W.2d 571 (1997). A related concern is that an employer should not incur liability for independently justified adverse personnel action simply because animus may exist based upon prior reports of wrongdoing. *See Texas Dep't of Human Serv. v. Hinds,* 904 S.W.2d 629, 635 (Tex.1995). As the Supreme Court explained in the context of retaliation analysis involving protected constitutional rights:

A borderline or marginal candidate ... ought not to be able, by engaging in [constitutionally protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977).

To harmonize the above goals of protecting employees from discrimination or reprisal, and protecting employers from opportunistic use of the Whistleblower Law, we hold that, to satisfy the dictates of Section 1424(c), 43 P.S. § 1424(c)—that is, to successfully rebut a *prima facie* case of reprisal—the employer must prove that it would have taken the same adverse employment action absent the employee's good-faith report of wrongdoing. *See Hinds,* 904 S.W.2d at 634–36 (concluding that "the standard of causation in whistleblower and similar cases should be that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did[;] ... this best protects employees from unlawful retaliation without punishing employers for legitimately sanctioning misconduct or harboring bad motives never acted upon").[12]

In the present case, it is undisputed that Appellees would not have removed O'Rourke from the acting supervisor list or

12. *See generally Mount Healthy,* 429 U.S. at 285–86, 97 S.Ct. at 575 (holding that the controlling question in retaliation cases is whether the employer would have reached the same decision absent the protected conduct); *Dysert v. United States Secretary of Labor,* 105 F.3d 607, 609 (11th Cir.1997)(observing that, under the nuclear whistleblower provision of the federal Energy Reorganization Act, an employer may avoid investigation by the Secretary of Labor by demonstrating "that it would have taken the same unfavorable personnel action in the absence" of the employee's report of wrongdoing); *Anslinger,* 794 F.Supp. at 646 (noting that, under the OSHA whistleblower provisions, a defendant employer is immune from liability if it proves that it would have reached the same personnel decision in the absence of the protected activity); *Melchi, supra,* 597 F.Supp. at 583; Robert G. Vaughn, *State Whistleblower Statutes and the Future of Whistleblower Protection,* 51 ADMIN. L.REV. 581, 605–611 (1999)(surveying various jurisdictions' definitions of "reprisal," and concluding that "[a] common standard is that [, to avoid liability,] the employer must show that the action would have been taken against the whistleblower without consideration of the protected disclosure").

Employers and co-workers are also protected from employee harassment by the requirement that the report of wrongdoing be made in good faith in the first instance. *See* 43 P.S. § 1424(b). *See generally* Stefan Rutzel, *Snitching for the Common Good: In Search of a Response to the Legal Problems Posed by Environmental Whistleblowing,* 14 TEMP. ENVTL. L & TECH. J. 1, 48–49 (Spring 1995)(advocating a model statute

moved him to the food service line in the dining hall had O'Rourke not filed his good-faith report of wrongdoing. To the contrary, the Commonwealth Court found that Appellees took such actions as a direct result of O'Rourke's report. This is not to say that such actions were illegitimate, given the realities of prison life and the actual or potential presence of violent activity. The plain words of the statute, however, and the policy underlying the enactment, impose an additional requirement of "separateness," as explained above, to encourage good faith reporting of illicit activities and for the protection of those who actually make good faith reports. While there may be (as the Commonwealth Court found) compelling reasons to support the administrative action ultimately taken by the Department in the time frame in which it was accomplished, the circumstances prevailing prior to O'Rourke's report of misconduct cannot be overlooked. From the Commonwealth Court's findings, it is clear that there prevailed at SCI–Dallas an intolerable situation involving systematic theft of government property, which was condoned or deliberately overlooked by government employees in positions of substantial trust. O'Rourke's report became the impetus for necessary corrective action, as well as the cause of a heightened potential for conflict in the post-corrective period. In such circumstances, where the reasons for administrative action involving reassignment and diminution in status cannot be deemed separate from the report of misconduct, the Whistleblower Law requires that the burden of such action fall upon the Department and not upon O'Rourke.

In summary, because the Department did not prove that its actions occurred for reasons that were separate from the report of wrongdoing, it failed to rebut O'Rourke's *prima facie* case, and O'Rourke is entitled to compensation pursuant to the Whistleblower Law, as the Commonwealth Court deems appropriate on remand.

Cause remanded for further proceedings.

ZAPPALA, Justice, concurs in the result.

which prevents frivolous complaints and employee harassment by protecting "only good faith whistleblowing").