**Angela Maria PACKER,**
**R.N., Petitioner,**

v.

**BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, DEPARTMENT OF STATE, STATE BOARD OF NURSING, Respondent.**

**Hope A. Murphy, R.N., Petitioner,**

v.

**Bureau of Professional and Occupational Affairs, Department of State, State Board of Nursing, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 16, 2014.

Decided Sept. 17, 2014.

Nicholas J. Godfrey, Pittsburgh, for petitioners.

Carole C. Smith, Senior Counsel–in–Charge, Harrisburg, for respondent.

BEFORE: BONNIE BRIGANCE LEADBETTER, Judge, and P. KEVIN BROBSON, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge BROBSON.

In these consolidated petitions for review, petitioners Angela Maria Packer, R.N., and Hope A. Murphy, R.N. (collectively Petitioners), petition for review of orders of the State Board of Nursing (Board). The Board issued final orders suspending Petitioners' licenses to practice professional nursing for a ten-year period.[1] We affirm the Board's orders.

A prosecuting attorney within the Department of State's Bureau of Occupational Affairs filed petitions for automatic suspension pertaining to Petitioners. By orders mailed August 21, 2013 and October 11, 2013, the Board respectively ordered the suspension of Packer's and Murphy's licenses, based upon guilty pleas Petitioners entered to charges under Section 13(a)(12) of the Controlled Substance, Drug, Device and Cosmetic Act (Drug Act).[2] In its automatic suspen-

sion orders, the Board relied upon several provisions of The Professional Nursing Law (Law),[3] including Section 15.1(b) of the Law,[4] Section 15.2 of the Law,[5] and Section 6(c) of the Law.[6]

The Board's orders indicated that Petitioners could choose to file an answer to the petition for automatic suspension and request a hearing, but that such a response could only raise a challenge to the averment in the petitions that Petitioners had been convicted of the offense identified in the petitions—*i.e.*, the felony violation of Section 13(a)(12) of the Drug Act. Petitioners, who did not contest their felony convictions, did not request hearings.

The Board issued its final orders of automatic suspension with mailing dates of October 11, 2013 (as to Packer), and November 7, 2013 (as to Murphy). Both orders are essentially identical. In those orders, the Board noted that Petitioners had not responded to the notices and orders of automatic suspension. Thus, the Board made its notices and orders of automatic suspension final, directed Petitioners to cease the practice of nursing, and directed Petitioners, if they had not already done so, to return their wall certificates, wallet cards, and registration certificates

---

1. Petitioner Packer's petition for review docketed at 1600 C.D. 2013 challenges the Board's August 21, 2013 notice and order of automatic suspension. Petitioner Packer's petition for review docketed at 1985 C.D. 2013 challenges the Board's final order, as does Petitioner Murphy's petition for review docketed at 2026 C.D. 2013.

2. Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. § 780–113(a)(12). Violation of Section 13(a)(12) of the Drug Act constitutes a felony, and prohibits "[t]he acquisition, or obtaining of possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge."

3. Act of May 22, 1951, P.L. 317, *as amended*, 63 P.S. §§ 211–225.5.

4. Added by Section 13 of the Act of December 20, 1985, P.L. 409, 63 P.S. § 225.1(b).

5. Added by Section 13 of the Act of December 20, 1985, P.L. 409, 63 P.S. § 225.2.

6. Added by Section 7 of the Act of December 20, 1985, P.L. 409, *as amended*, 63 P.S. § 216(c). In its automatic suspension orders, the Board appears to have mis-cited this provision as 63 P.S. § 616(c) in the case of Packer and as 63 P.S. § 219(c) in the case of Murphy.

to the Board within ten days of the mailing date of the final orders.

As indicated above, Packer, out of an abundance of caution, filed a petition for review of the Board's notice and order of automatic suspension, as well as the Board's final order. Murphy filed the single petition for review of the final order. All of the petitions for review raise the same allegations of error on the part of the Board. Petitioners acknowledge that they pled guilty to felony violations of the Drug Act. Petitioners claim, however, that the Board's orders improperly deviate from the Board's previous practice in identical cases, whereby, Petitioners allege, the Board would approve consent decrees for such licensees that provided for a three-year stayed suspension of licenses. Petitioners argue that the Board erred as a matter of law by engaging in a new interpretation of the Law that precludes them from seeking to reacquire the right to practice for a minimum period of ten years based on the automatic suspension.[7]

We begin by quoting the key provisions of the Law relating to suspensions and revocations of nursing licenses. Pursuant to Section 14 of the Law,[8] the Board has the discretion to refuse, suspend, or revoke any license if it finds that certain enumerated circumstances exist. Section 15 of the Law[9] addresses the procedures for suspensions and revocations of licenses following a hearing before the Board:

All suspensions and revocations shall be made only in accordance with the regulations of the Board, and only by majority vote of the members of the Board after a full and fair hearing before the Board. All actions of the Board shall be taken subject to the right of notice,

hearing and adjudication, and the right of appeal therefrom.... *The Board, by majority action and in accordance with its regulations, may reissue any license which has been suspended. If a license has been revoked, the Board can reissue a license only in accordance with section 15.2.*

(Emphasis added.) Section 15.1(b) of the Law, however, which was added in 1985, mandates that the Board automatically suspend licenses under certain circumstances prior to a hearing. Of relevance to the circumstance now before the Court, Section 15.1(b) of the Law provides, in part:

(b) A license issued under this act shall automatically be suspended upon the legal commitment to an institution because of mental incompetency from any cause ..., *conviction of a felony under the [Drug Act,] or* conviction of an offense under the laws of another jurisdiction, which, if committed in Pennsylvania, would be a felony under [the Drug Act].... Automatic suspension under this subsection shall not be stayed pending any appeal of a conviction. *Restoration of such license shall be made as hereinafter provided in the case of revocation or suspension of such license.*

(Emphasis added.) Section 15.2 of the Law, which follows immediately after Section 15.1(b), provides:

Unless ordered to do so by Commonwealth Court or an appeal therefrom, the Board shall not reinstate the license of a person to practice nursing ... which has been revoked. Any person whose license has been *revoked* may reapply for a license, after a period of at

---

7. Our review in this matter, where Petitioners do not challenge any factual findings, is limited to considering whether the Board erred as a matter of law. 2 Pa.C.S. § 704.

8. 63 P.S. § 224.

9. 63 P.S. § 225.

least five (5) years, *but must meet all of the licensing qualifications of this act for the license applied for*, to include the examination requirement, if he or she desires to practice at any time after such revocation.

(Emphasis added.)

The Board and Petitioners disagree as to whether Section 15.2 or Section 15 applies for the restoration of licenses that are subject to automatic suspension pursuant to Section 15.1(b) of the Law. Petitioners argue that because the automatic suspension provision—*i.e.,* Section 15.1(b) of the Law, is itself silent as to the period of automatic suspension, and Section 15.2 of the Law, upon which the Board relied, relates to reinstatements of revoked rather than suspended licenses, the Board erred in its interpretation of the Law. Petitioners argue that Section 15 of the Law applies to licenses that are automatically suspended under Section 15.1(b) of the Law, and that this provision vests the Board with discretion as to the length of time of an automatic suspension.

In contrast, the Board reasons that the language of Section 15.1(b) of the Law that provides that the restoration of a license subject to automatic suspension "shall be made as hereinafter provided in the case of revocation or suspension of such license," refers to the subsequent provisions found in Section 15.2 relating to revocation. Thus, the Board contends that the provision of Section 15.2 that imposes a five-year period before a former licensee may seek reinstatement of a *revoked* license applies to automatic suspensions as well. The Board argues that the requirement in Section 15.2 of the Law that such licensees must demonstrate that they "meet all of the licensing qualifications of this act for the license applied for," therefore, applies to persons whose licenses have been suspended pursuant to the auto-

matic suspension provisions of Section 15.1(b) of the Law. Thus, such licensees, the Board contends, are precluded from seeking the right to practice again until they satisfy the Law's qualification provision, Section 6(c) of the Law, which provides in pertinent part:

> (c) *The Board shall not issue a license or certificate to an applicant who has been convicted of a felonious act prohibited by the [Drug Act] . . . unless:*
>
> *(1) at least ten (10) years have elapsed from the date of conviction;*
>
> (2) the applicant satisfactorily demonstrates to the Board that he has made significant progress in personal rehabilitation since the conviction. . . . and
>
> (3) the applicant otherwise satisfies the qualifications contained in or authorized by this act.

(Emphasis added.) . The Board argues that it must read all three of these sections together, and that Petitioners are disqualified under Section 6(c) of the Law from seeking to obtain the right to active practice until after ten years from the date of their convictions.

Both the Board and Petitioners present statutory construction arguments regarding the meaning and application of the Law's automatic suspension provisions. Courts should resort to statutory construction only "[w]hen the words of the statute are not explicit" or are ambiguous. 1 Pa. C.S. § 1921(c). "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines, Inc. v. Dep't of Envtl. Prot.,* 676 A.2d 711, 715 (Pa.Cmwlth.), *appeal denied,* 546 Pa. 668, 685 A.2d 547 (1996).

The key language in this case is found in Section 15.1(b) of the Law. The subject of that provision is automatic suspensions. The final sentence of that provision concerns the method by which the Board may

lift such a suspension and is the focus of the parties' distinct interpretations of the Law: "Restoration of such license shall be made as hereinafter provided in the case of revocation or suspension of such license." Section 15.1(b) of the Law does not make clear what provisions of the Law relating to the restoration of licenses for suspension or revocation are applicable to the restoration of an automatically suspended license. Because we agree that the statute lacks clarity with regard to which provision or provisions of the Law govern the length of time of an automatic suspension under Section 15.1(b) of the Law, we conclude that this provision is ambiguous. Consequently, we must resort to the rules of statutory construction in order to resolve the ambiguity.

When a statute is ambiguous, we must endeavor to determine the General Assembly's intention. 1 Pa.C.S. § 1921(a). Section 1921(c) of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1921(c), further provides:

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

. . .

(4) The object to be attained.

. . .

(6) The consequences of a particular interpretation.

(7) The contemporary legislative history.

(8) Legislative and administrative interpretation of such statute.

Additionally, we presume "[t]hat the General Assembly did not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1).

 The Board relies upon the principle of administrative deference in support of its position. As suggested by Section 1921(c)(8) of the Statutory Construction Act, when a statute is ambiguous, courts generally defer to the expertise of the agency upon which the General Assembly has vested enforcement or interpretive responsibilities and, consequently, should accept the agency's interpretation of ambiguous statutory language. *Velocity Express v. Pa. Human Relations Comm'n*, 853 A.2d 1182, 1185 (Pa.Cmwlth.2004) (*Velocity*). When an agency's interpretation is entitled to such deference, courts will defer to such proposed interpretation unless an agency's interpretation of a statute is erroneous or "frustrates legislative intent." *Id.* (quoting *Rosen v. Bureau of Prof'l and Occupational Affairs*, 763 A.2d 962, 968 (Pa.Cmwlth.2000), *appeal denied*, 566 Pa. 654, 781 A.2d 150 (2001)). Thus, when both parties proffer interpretations of a statute that are *reasonable*, courts generally give greater deference to the administrative agency's interpretation. *Id.* The Board relies heavily on this principle.

There are, however, exceptions to this general rule of deference. Petitioners argue that an administrative agency's interpretation of its governing legislation is not entitled to deference where the interpretation has not been formally adopted by the agency through the formal rule-making process—*i.e.*, notice, comment, and review procedures. Petitioners further argue that no deference is due the Board's interpretation because the Board previously construed the statute as providing the Board with discretion. Petitioners cite no adjudications of the Board setting forth a previous interpretation, but include examples of consent agreements they claim typify the Board's previous practice. Based

upon these unauthenticated documents, Petitioners argue that we should not defer to a new policy decision by the Board that the Board has not formalized through a formal rule-making process. While Petitioners have not cited authority for this Court to take judicial notice of consent decrees, the Board itself admits that it has altered its application of the Law based upon directions from its parent agency, the Department of State, Bureau of Professional and Occupational Affairs.[10] Thus, we can reach the implicit conclusion that the prosecutorial arm of the Bureau of Professional and Occupational Affairs (Bureau) applied the Law to nurses in a discretionary manner until its parent agency, the Bureau or the Department issued an unidentified directive in 2013 to all health profession boards, at which time, the Board (and apparently prosecutors in the Bureau) proceeded to apply the Law in a non-discretionary manner.[11]

There are many factors that will affect the degree of deference courts accord to an agency's interpretation of a governing statute. Most questions involving the degree of deference to which an agency's interpretation is due arise in situations where an agency has either promulgated regulations interpreting a statute or has issued some less formal statement indicating its interpretation of a statute. The United States Supreme Court has differentiated between formal agency interpretations (which typically follow some procedural mechanism before adoption) and informal interpretations. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (agency's regulation reflecting reasonable interpretation of ambiguous statute entitled to deference); *Christensen v. Harris Cnty.*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (informal interpretations of ambiguous statute entitled only to respect, not *Chevron* deference).

In this case, we have no evidence of a formal interpretation of the statute or even an informal interpretation. The Board has not promulgated rules or regulations and has apparently not issued any policy guidelines regarding how it interprets the Law. In the absence of any regulations, rules,

---

**10.** At page 4 of its brief, the Board states:

The Board does not agree with Petitioners' argument that it was its usual and customary practice to approve Consent Agreements placing nurses convicted of felonies under the Drug Act on probation. Certainly there were instances where the prosecution division of the Department of State, Bureau of Professional and Occupational Affairs entered into Consent Agreements with certain licensees that reinstated the license to a probationary status prior to ten years from the date of conviction. However, not all nurses with felony Drug Act convictions were offered Consent Agreements with a stayed suspension. Many nurses remain suspended today after their felony convictions under the Drug Act. In 2013, the agency looked at all the practice acts containing automatic suspension provisions for conviction of felonies under the Drug Act and determined that certain boards had been improperly interpreting their acts for years, leading to disparate treatment among licensed healthcare providers.... The agency made the determination that the language in all the acts with automatic suspension provisions authorized the boards to impose a ten year automatic suspension and that all healthcare providers should be treated equally.

**11.** The Board contends that before it changed its application of the Law, the prosecutors in the Bureau could elect to engage in negotiations culminating in consent decrees, but that prosecutors did not agree to probationary-type agreements in all cases. Nevertheless, it is clear that the Bureau and the Board have eliminated any previous course of proceeding that avoided automatic suspensions. . Thus, Petitioners' claim that the interpretation of the Law has changed appears to be grounded in fact.

policy, or formal adjudication, we do not believe we owe the Board's new interpretation of a statute, expressed apparently for the first time in the context of a brief filed in response to an appeal from the Board's final order, any deference. The Statutory Construction Act, as we noted above, provides other interpretive tools, including Sections 1921(c)(1)-(7) and Section 1922(1) of the Statutory Construction Act, which aid in our efforts to determine the General Assembly's intent.

The Board contends that Petitioners' suggested interpretation is unreasonable and compels an absurd result. The Board argues that Petitioners advocate a construction of the Law that would treat licensed professionals less harshly than those persons who have not yet obtained a license or those in other health care professions, such as medical doctors and pharmacists. The Board asserts that a key factor to consider is that persons who have obtained licensing and practice in a health care profession, such as nurses, possess an existing position of trust.

In support of its position, the Board also draws a comparison between the Law and the other laws governing licensure of various types of healthcare professionals, some of which do not contain express and direct language regarding the period of automatic suspension,[12] and some of which do contain specific provisions describing the disqualification period following an automatic suspension [13, 14] for a felony violation under the Drug Act. The Board contends that, if the Court accepts Petitioners' view of the Law, then some licensed healthcare professionals would be treated less harshly than others. The Board argues that the General Assembly could not have intended such an incongruous result.[15]

Petitioners, on the other hand, rely on the distinction between persons who have licenses and those who seek to obtain an initial license following a conviction under the Drug Act as support for their position. Petitioners claim that their property interest in their licenses [16] provides a reason why the General Assembly would intend not to disqualify them from practicing for ten years unlike initial applicants and persons whose licenses have been revoked. Petitioners rely upon the distinction in statutory provisions as support for their

12. See the Osteopathic Medical Practice Act (OSPA) of October 5, 1978, P.L. 1109, as amended, 63 P.S. §§ 271.1–.18.

13. See the Medical Practice Act of 1985 (MPA) of December 20, 1985, P.L. 547, No. 112, as amended, 63 P.S. §§ 422.1–.51a.

14. See the Pharmacy Act of September 27, 1961, P.L. 1700, as amended, 63 P.S. §§ 390–1–390–13.

15. The Board also offers comments made by then-State Representative Richard Cessar during legislative proceedings regarding the 1985 amendment to Section 6(c) of the Law. According to the Board, Mr. Cessar believed that non-licensees were generally barred entirely from applying to obtain a license, whereas licensees could seek to recover the right to practice, and Mr. Cessar submitted

amendments to the proposed legislation so that the statute treated both applicants and licensees equally with regard to convictions under the Act. The Board argues that his comments support an inference that the General Assembly intended for the ten-year disqualification provision to apply to licensed nurses as well. Representative Cessar's comments do no go that far. Moreover, "comments of individual legislators made in debate are not properly considered when ascertaining legislative intent." Montgomery Cnty. v. Dep't of Corr., 879 A.2d 843, 847 (Pa.Cmwlth. 2005).

16. See Brown v. State Bd. of Pharmacy, 129 Pa.Cmwlth. 642, 566 A.2d 913, 915 (1989) (holding that unlike a licensee whose license has been revoked, a licensee whose license has only been suspended retains property interest in his or her license).

argument that the General Assembly did not intend to impose a blanket ten-year suspension for licensed nurses, but rather intended to leave the decision as to the length of an automatic suspension with the Board in its discretion. Petitioners also rely upon the General Assembly's choice of words in the Law. Petitioners argue that the Law indicates that the means by which a nurse whose license has been suspended may seek the return of a license is through *restoration,* whereas, the General Assembly, in Section 15.2 of the Law provides for *reinstatement,* which, Petitioners contend, is applicable only to licenses that the Board has *revoked.* Petitioners also argue that the Board's proffered interpretations would render Section 15 of the Law superfluous,[17] which the rules of statutory construction disfavor.[18]

■ After considering these arguments, we conclude that the Board's suggested interpretation is more reasonable than the interpretation offered by Petitioners. The Law is structured in a manner that affords the Board discretion (through decision making or regulation) to suspend or revoke a license under certain circumstances (Section 14 of the Law) and removes discretion from the Board in other circumstances by mandating that the Board suspend a license if certain circumstances exist (Section 15.1(b) of the Law). It would appear that the General Assembly, in mandating license suspensions under Section 15.1(b) for certain drug convictions and legal commitments based on mental incompetency, viewed those circumstances to be sufficiently serious such that it removed from the Board its discretion not to suspend or revoke a license. In other words, the General Assembly viewed those circumstances to be so serious that suspension is mandatory and automatic. Given that the General Assembly took measures to remove discretion from the Board by legislating automatic suspension, it would seem unlikely that the General Assembly would then allow the Board to exercise discretion and lift an automatic suspension at any time. Rather, it is much more likely that the General Assembly contemplated that an automatic suspension would remain in effect for at least some minimal period of time, which is consistent with the Board's interpretation of the Law.

Thus, the framework of the Law may be summarized as follows. Section 14 sets forth the discretionary bases for suspension or revocation. Section 15 provides, in part, that for those (discretionary) suspensions and revocations issued pursuant to Section 14, the Board may reissue any license it suspended and may reissue any revoked license only in accordance with Section 15.2. Section 15.1(b) then carves out circumstances that require mandatory automatic suspension and then provides that "[r]estoration of such license shall be made as *hereinafter* provided in the case of *revocation or suspension* of such license." Section 15.1(b) of the Law (emphasis added). The section immediately following that language is Section 15.2,

---

17. Section 15 of the Law provides in pertinent part as follows:

 All suspensions and revocations shall be made only in accordance with the regulations of the Board, and only by majority vote of the members of the Board after a full and fair hearing before the Board. All actions of the Board shall be taken subject to the right of notice, hearing and adjudication, and the right of appeal therefrom....

 The Board, by majority action and in accordance with its regulations, may reissue any license which has been suspended. If a license has been revoked, the Board can reissue a license only in accordance with section 15.2 [of the Law].

18. 1 Pa.C.S. § 1921(c); *Appeal of Hadley,* 83 A.3d 1101, 1106 (Pa.Cmwlth.2014).

which requires a person whose license has been suspended to wait five years before reapplying and further provides that the person "must meet all of the licensing qualifications of this act." Section 15.2 of the Law. The reference in the last sentence of Section 15.1(b) to provisions for "suspension and revocation," provides sufficient room to encompass Section 15.2. The fact that Section 15.2 refers specifically only to licenses that the Board has revoked is inconsequential, because Section 15.1(b) directs that provisions for revocation or suspension be used in the case of automatic suspensions. Moreover, this interpretation allows the Court to give effect to the term "hereinafter" contained in Section 15.1(b), by interpreting it as directing that one apply the provisions following Section 15.1(b)—*i.e.*, Section 15.2—as opposed to applying Section 15, which precedes Section 15.1(b).[19]

The Board's and Petitioners' reliance on the various amendments enacted in 1985 by the General Assembly to numerous health-care-professional statutes in support of their positions is unpersuasive. The Board argues that the other enactments make clear that the General Assembly intended all health-care professionals to be subject to the same ten-year automatic suspension. Petitioners conversely argue that the enactments establish that the General Assembly knew how to craft specific statutory language to create an automatic suspension period of ten years, thus, it must not have intended to do so in this instance. Both parties place too much emphasis on provisions outside of the Law. We do not read anything into the General Assembly's decision not to specify in Section 15.1(b) of the Law the length of an automatic suspension, particularly because Section 15.1(b) mandates suspensions for more than just convictions under the Drug Act. Section 15.1(b) of the Law mandates automatic suspension for legal commitments based on mental incompetency as well as convictions for drug offenses. Also, the General Assembly may have concluded that such a provision in Section 15.1(b) would be redundant, given that a person seeking to become fully-licensed following an automatic suspension would be required under Section 15.2 of the Law to comply with Section 6(c) of the Law.

Moreover, we do not agree with Petitioners' various arguments in support of their position. First, we conclude that Petitioners' reliance upon the holding in *Brown v. State Board of Pharmacy*, 129 Pa.Cmwlth. 642, 566 A.2d 913 (1985), that licensees whose licenses have been suspended retain a property interest in their licenses, is misplaced. In *Brown*, we simply recognized the property interest and held that retroactive application of the 1985 amendments was unconstitutional. We also do not find persuasive Petitioners' argument that the General Assembly did not intend Section 15.2 of the Law to be applicable to suspensions, based upon the choice of the word "reinstatement" in that provision, when Section 15.1(b) of the Law refers to "restoration" of suspended licenses. In reading the various provisions relating to the different types of disciplinary sanctions, the General Assembly did not use uniform language with regard to the act of returning a person to a fully-licensed status following a suspension or revocation. In fact, Section 15 of the Law, which Petitioners seek to use for purposes of "reinstatement" of their licenses, does not use the word reinstatement. Rather, Section 15 of the Law authorizes the Board to "reissue" suspended and revoked licenses.

---

19. The term "hereinafter" is defined as "after this" and "in the following part of this writing or document." Webster's Third New International Dictionary 1059 (1993).

Thus, under Petitioners' logic, neither section could be utilized.[20]

We also reject Petitioners' claim that the General Assembly intended Section 15 of the Law, which refers specifically to both suspensions and revocations, to be the provision to which Section 15.1(b) of the Law refers. As discussed above, we view Section 15 of the Law as addressing suspensions other than those imposed under Section 15.1(b). Thus, when this provision directs that "[t]he Board, by majority action and in accordance with its regulations, may reissue any license that has been suspended," we believe that the General Assembly intended for the Board to have discretion over the length of a suspension only with regard to suspended licenses that are not automatically suspended under Section 15.1(b) of the Law. Moreover, contrary to Petitioners' argument, this interpretation does not render Section 15 merely superfluous. Section 15 applies to suspensions and revocations issued pursuant to Section 14 of the Law. Also, if we were to hold otherwise, we would be ignoring the General Assembly's use of the word "hereinafter" in Section 15.1(b).

In summary, we conclude that the Board's efforts to harmonize Sections 15.1(b) and 15.2 of the Law, the latter of which triggers the qualification requirements of Section 6 of the Law, is more reasonable than Petitioners' interpretation and is not unreasonable. Accordingly, we conclude that the Board did not err in its interpretation of the Law, and we affirm the Board's orders.

Senior Judge COLINS dissents.

### *ORDER*

AND NOW, this 17th day of September, 2014, the orders of the State Board of Nursing are AFFIRMED.

---

**20.** We find it reasonable to conclude that the General Assembly used the various terms—reissuance, restoration, and reinstatement—in an essentially interchangeable manner in Section 15 of the Law. For this reason, we also conclude that the General Assembly's directive in Section 6(c) of the Law—the qualification provision containing the ten-year disqualification period—that "[t]he Board shall not *issue* a license … to an applicant who has been convicted" (emphasis added) under the Drug Act, applies equally to the *reissuance* (or restoration or reinstatement) to licensees of licenses that have been suspended pursuant to Section 15.1(b) of the Law.